First case on our docket this morning is 21-50642, United States of America v. Campos-Ayala. Mr. O'Neill. May it please the Court. I'll begin by addressing, I'll be addressing the Sufficiency and the Miranda issues. To start with Sufficiency, Mr. Campos and Mark Moncada argue that when they wedged themselves in between five 50-pound bundles of marijuana, their touching of that marijuana and likely moving of it in order to fit themselves in a vehicle was not sufficient to offense possession. Can I ask a question about the standard of review? What is the best case for us to understand how to do sufficiency review when it's forfeited? The best case for us understanding, I don't have a case handy for the Court. Of course, the devoid of evidence standard is the case, the standard that the Court would look for for sufficiency, but I'd have to get back to you on the best case for that standard. Because obviously it's really hard when you preserve it. Like a sufficiency argument, when properly preserved under Rule 29, is really hard. Yes, sir. And so then if you add really hard, whatever that means, to forfeited clear error, and now we're doing clear errors times really hard. I'm not sure what the product of those two variables is, but I know it's really, really hard. Right. I agree, Your Honor. And of course, the parties agree that Mr. Campos has preserved a de novo review on the sufficiency issue, and Mr. Moncada is going forward under the devoid of evidence standard. Here we would argue that the facts meet both of those standards, even though it is really hard. Just because of the evidence is not, the facts that go to either standard are not contested at all. The parties agree that these two gentlemen crossed into the United States illegally, were looking for transport into the United States, were dropped off in the area of Van Horn, which is sufficiently in the interior, not quite on the border, but then were looking to go further. And while they were waiting for their transportation, the driver went off, picked up some marijuana, loaded up his cart, and then they kind of wedged themselves in, in order to get further into the interior in Odessa. I'll ask this question to Mr. Durbin, too, but do you have a citation for Mr. Campos's preservation of the sufficiency argument? Because I understand the government agrees with you on that, but we also have precedent that says the government can't waive or forfeit or agree to the standard of review. We have to determine it ourselves. I can't find a citation in the trial transcript for where Mr. Campos preserved his sufficiency argument. So Mr. Campos made the initial Rule 29 motion, and then he didn't put on any additional evidence. So I think you're referring to, there's not an instance where Mr. Campos renewed his, his Rule 29 motion, and that's accurate. But it was Moncada's attorney who called a witness to testify briefly on the meaning of possession in Spanish, and then neither of them mentioned the Rule 29 motion again. So that's accurate. And is that not fatal? Obviously, you have to renew it in order to preserve it. Our argument, my argument is that because Mr. Campos didn't put on any evidence, he was not required to renew it. But going back to possession, this Court defined, and it's difficult to find a good case that fits this fact pattern in which the Court talks about possession, but the Court's recent opinion in Smith gives the clearest definition of possession that is, I think, helps us understand how this case works. And there, the Court says that possession is about control, and that absent some indication that the defendant controlled the item, a conviction for possession is improper. Here, I think it's useful to look to an analogy that doesn't involve a controlled substance. Imagine, you know, a farmer is driving down the road with a crate of oranges, with crates of oranges in the back of his truck. He sees some stranded motorists who are trying to hitchhike. He says, go ahead and get back in the truck. The motorists sort of, or the motorists who, you know, load up in the bed of the truck rearrange the crates of oranges so that they can sit down to make room for their legs or to find a place to sit on. And then, you know, proceed on into the next town. At no point do they take possession or event control of the crates of oranges. You could imagine them, you know, being rude and starting to eat them, and then you would say they've exerted control over them. Or you would imagine that upon arrival, maybe they pick one up and walk off with it, and at that point, they would exert control over it. But merely rearranging them within a car in order to make space for them and to achieve their end of getting a ride does not offence the level of control necessary for possession. And even less... Is it a matter that they're sitting there holding these 60-pound things in their lap as part of the... Yes, Your Honor. There was one person in the car who was holding it in her lap. That's Castro, who was not actually charged. But no, my argument for Castro, if she had been charged, would be the same, that, you know, her putting it in her lap was, you know, in... She's got her kid, and she's got this 60-pound thing, and it's just pitiful. They'll vitiate. It's pitiful. Yes, Your Honor. Anyway. Because you don't think it matters whether you're holding the oranges or the marijuana in your lap. Holding it would certainly make it look more like possession, and that it... What about this one? Who's this with the... Like, he's literally sitting on two huge bales. Right. And our argument is that the extent of their contact is not with the substance, is not what determines possession. And some of them were kind of under it, probably, at some point, because it was presumably things jostled around while they were driving. But they at no point have any, you know, desire to control or hold this substance. And in fact, if they had gotten out of the car and taken it with them... That would be... The driver would have been after them in a second, because that wasn't their marijuana to be taken, because they didn't actually control it in that way. Exactly. And that was my next point on the... On the... An orange analogy. You would imagine that if somebody tried to walk off with the guy's oranges, he would say, those are my oranges. And what the court says in Smith is that the question of possession is about being the master of the item. And it no... And yes, these... Our clients would have been in, I think, substantial danger if they tried to, you know, exert the level of control. But why didn't... That was to the jury. I mean, it's... Jury certainly could have said, these are just kind of bystanders who happen to be in the wrong place. But they... It didn't. That's correct, Your Honor. But... Why do you think they saw it differently about control and possession? I think that they fundamentally misunderstood what possession means. I think that they thought, you know, if you're sitting on top of something, that's good enough. I mean... Well, is it really about possession or is it about intent to distribute? Thank you, Your Honor, because that... I was trying to... I was looking to pivot to that. Is there any evidence at all that had they reached the destination of the drug trafficker that these people would have helped unload the packages? There is no evidence of that at all. There's no mention of what would have happened upon arrival at the destination. The one thing that we can speculate on is, here the driver was clearly doing two different jobs at once. He was transporting people here illegally, and he was picking up marijuana. He had a separate location to pick them up. It's quite possible that he would have dropped off the aliens and then taken the marijuana, you know, further on. Do we not have cases that say the sheer volume of the drugs is probative of the intent to distribute? I mean, this is 280 pounds of marijuana? It's 120 kilos, but I'm not sure. Yes. That they're sitting on? Yes. No, it's... Obviously, no one in the car was going to smoke the marijuana, and obviously the driver intended to deliver the marijuana to someone else. Interestingly, the government didn't charge this as conspiracy or aiding and abetting. Our clients did not have any intention or care what happened to the marijuana. They like... I mean, the evidence suggests they would have been just as happy to, you know, throw it out of the car to make room for themselves. Their intention was to get in a car and be transported further into the U.S., and that was the entirety of their intention. Moving on to the Miranda issue, if there aren't any other questions on that, we... The question before the district... The district court decided this based on finding that Mr. Moncada and Mr. Campos were not detained or not in custodial detention when they were asked the questions they were about their relationship to the marijuana. We argue that that was an error most clearly because of the amount of restraint they were under and the accusatory nature of the questioning. They were... While the questioning itself was short, the first trooper to arrive basically transformed the car into a holding cell. He was there with one other trooper. He expressed during the video that Judge Elrod referred to that he doesn't... He didn't want to engage in a foot chase, that he was waiting for Border Patrol agents to show up in order to take custody of our clients because they were going to be arrested because he could see... I mean, the car was loaded with marijuana. It was obvious that there was going to be an arrest. And he basically transformed the car into a holding cell to achieve his purpose of waiting for the Border Patrol agents to arrive. Then when the Border Patrol agents did get there, they first took the driver and put him in a transport van so it was clear that person was being arrested. Then they took the front seat passenger and her child and also put them in the transport van. And that's where Mr. Moncada and Campos were headed when the questioning began. The first questioning, Agent Ramos positions himself in the one open door to stop any exit and asks them, do you know what you're sitting on, confirms that they know it's marijuana. When Border Patrol normally takes custody of someone that they believe has just crossed illegally, what kind of custody is that? I would say that that's an arrest. What they normally do is they walk up to somebody and say, are you a U.S. citizen? If the person says no or if they have other reason to think that they aren't a U.S. citizen, they arrest that person. And that would be an arrest. I thought it was called some other detention. I thought we've had some technical cases and it's called something else. I'll have to look into that. I don't know if they normally take detention of a person crossing. I don't know. I don't have that readily in mind, Your Honor. So the only thing that they said is that that's marijuana and I just helped. So are these, does this matter? I think the statement that I helped does matter and the statement that it's marijuana goes to their knowledge. But I mean, it was abundantly clear. I agree. But so the statements of their relationship to the marijuana, I think did matter and were relied on by the government repeatedly in the opening and closing arguments. But I helped and I thought they meant I helped move the barrel, the bale or whatever it's called. Yes, Your Honor. So they're asked these sort of questions that assume a premise that is what makes them guilty. They're asked, I think, you know, did you, why did you cross that marijuana? And they said, I didn't cross, I helped. And you know, obviously we think that once the whole story of, you know, their degree of the relationship to the marijuana didn't, that didn't amount to a confession is our argument. But the government did repeatedly say that they should be found guilty because they helped and the jury believed that argument. But this is not a case where it's multiple versions and people are saying people are lying. This is a kind of unique case when the government's not saying your people are in on some kind of mastermind deal and they've been dealing with the dealer. They say, no, you know, you're just the people in the car. Right. So I don't know that the Miranda matters. I think it just matters to the extent that the government to the jury was arguing these people possessed it, they're touching it, and their claim that they helped in some way is sufficient to show that they possessed it. And so I think our statement that I helped ended up hurting us in front of the jury. Thank you. Thank you. Mr. Lynch. I'm not the easiest fit. Judge Oldham, you're right. The misdemeanor is under the utterly lacking in evidence or devoid of evidence. I think this is the rare case in which we have that, particularly Judge Elrod on the intent to distribute. As you mentioned, that's a key here. And I think what's important to look at are the definitions under the Controlled Substances Act. The definition of deliver, distribute, is deliver. And that's 802.11. The definition of deliver, which is 802.8, is the actual constructed or attempted transfer. And so what we have to have is possession, and I'll come back to that in a second too, with the intent to make a transfer. And the evidence in this case is utterly lacking. What happened in this case is that these people, including Castro, entered the United States. They flagged down a ride. The government agrees that there's no conspiracy here. This is in some setup. They're dropped, and the guy says, I'll give you a ride to Odessa if you wait here. He comes back with marijuana. Well, they want their ride to Odessa. They push the marijuana around. They put a bundle on Ms. Castro, who, as Mr. O'Neill said, wasn't charged. Why wasn't she charged? Because as the agent says, and I believe the page numbers are different in the two records, but mine, it's at 1542 to 1547, the agent says, well, her statements indicated she wasn't affiliated with the marijuana. Well, it was really about the child, wasn't it? Because they didn't have a place to put the child, and they're under all the things that they can't keep the child with the adult. She had a little child, and they were being merciful, and also, they didn't have a practical way to put the child somewhere. Well, that's the Valenzuela-Bernal issue, Your Honor, and I would disagree on that also. Okay, well, help. If that's not correct, my understanding of facts, correct me. You're absolutely correct on your understanding of facts, but we have to put that fact in the context of the law, and in the context of the law, Valenzuela-Bernal says the government has to make a good faith determination whether the witness has material favorable information, and if the witness has that information, the government can't remove them. And so, they interviewed Ms. Castro. They found she had material helpful information, and they sent her away. They didn't disclose that, okay? They didn't send her away immediately. They make a big deal about how they weren't victimizing innocents, and that's at 1547. They asked that at trial, which is one reason why having the agent testify to some of Castro's statements is not sufficient, and that Ms. Castro's testimony would not be cumulative, because the agents and the prosecutors are characterizing the story. They're not allowing Ms. Castro's account to be heard, but to Judge Elrod, to your question, so at that point, they could disclose. My understanding is that that statement was made on Christmas Eve, and that Ms. Castro was not removed until January 6th, the epiphany. So they had 12 days to make the revelation to us that she had made this statement. That would have allowed us to interview her. That would have allowed us to ask for a material witness deposition. They didn't do that. They kept that information from us, and then they deported her, and then, in the usual pile, well, now these days, it's a disk of discovery. We see that statement. All right. Exactly what do you think she would have said, and why do you think it's different from what the government conceives? Well, I think there are a couple of things that we see. One, the government, because, and Agent Catani says it, well, we already decided we're going to let her go. Well, back to that. I thought they said one reason they decided not to let her go, because she was too small to have lifted the 50-pound bail, so they knew she wasn't involved. Well, it's not a question of lifting or moving, because that goes back to the sufficiency argument. Mr. Moncada and Mr. Campos moved those things around so they could squeeze in like this and like this. Okay? And the government says, that's possessing. It looks like they're possessed by the marijuana. If I move your coat when I get in your back seat, that doesn't make me the master of your coat. That doesn't mean that I have reduced your coat to my control. Can I ask you this question? Suppose, hypothetical, that there is a felon in the United States, and the police pull over a car, and he has a handgun in his lap. They can't charge him under 922G as a felon in possession of the handgun? That I think... What if he's buried under 285 pounds of handguns, right? I mean... That would be... But there you have knowing possession. So, perhaps, Your Honor... Well, there's no doubt they knew. There's no doubt they knew. Absolutely. No, we're not disputing that. The question is, do they have possession? And I think one difference is the possession. I mean, if you were under 258 pounds of guns, it would be different. But if it's a single gun, then you can't... On the felon's lap. The police pull him over. It's right there on his lap. Right. I think it makes a difference, the type of thing that you're possessing.   possession. If I'm riding with you, and I have the gun in my lap, I can easily be reduced to your possession. You may own the gun, but I'm possessing it, right? That's not true with this amount of marijuana that I'm buried under. I don't have the right to direct the driver. I don't have the right to take that marijuana out of the car. I don't have possession. But even if you think we have possession, we don't have it with the intent to distribute. Can you answer Chief Judge Richman's other question that she had about what would the young woman have said that would have been helpful to your client at trial? Yes. My time is up. May I answer that question? Please answer me. Yes. She would have corroborated everything about the journey. She could have provided more details about the journey. Again, you can't just speculate. What would she have said, and how do you know what she said? Well, we know that she corroborated the details of the journey. We know that she was present when the marijuana came back. We know, and again, if you look at 1542 to 1547, that the government didn't ask questions about what she did. Why? Because they decided ahead of time that even though she has the marijuana in her lap, that she's unaffiliated. Well, we're in basically the same position, but they don't ask questions. Had this been disclosed, we get to ask questions. And I think a key thing is not just that her testimony, bits and pieces of her testimony came in. They're characterized. We don't know what faces the agents made. We do know we talked about victimizing innocence, which is clearly not a fact. That's a characterization of her story. I thought the victimizing innocence is about the child. Yes, absolutely. Not about the mother. And so I guess I want to know, do they say that she's unaffiliated, but the two gentlemen, your clients, were affiliated? Or did they say she is exactly similarly situated to them? Did the government argue that she was unaffiliated, but your clients were affiliated? I don't take that to be with the government. I thought they argued that she's the same as them, but they just let her go. Agent Catani's testimony was that they decided she was unaffiliated. Why? Because she didn't rearrange the marijuana. Well, she's sitting under a bundle of marijuana. Unaffiliated versus them who are affiliated? And they're affiliated because they're under the marijuana, just like her. Where is that? It's at 1542 to 1547 in my record, in Agent Catani's testimony. I'm sorry, Chief. No, no. I want to know that. 1542 to 1547, they say they're affiliated, but she's unaffiliated. Yes, in the Moncada record. Because I thought they had agreed all along that she was exactly similarly situated to the other people, but they just let her go because of convenience, et cetera. No, they make that statement. That's the testimony, and that testimony, if she's there, then we can hear, the jury can hear her story, observe her expressions, without the characterizations and the decisions of the government in presenting its version of her testimony. Did y'all cross the government to say, no, isn't she exactly, she got picked up exactly with them, they're exactly similarly unaffiliated? Did you cross over that? We did cross, but in this case, and particularly because, as the court has repeatedly recognized, and the Supreme Court has recognized it too in California v. Green, among other cases, that it's important for the jury to be able to evaluate the witness physically and to evaluate expressions, to evaluate tones. And the jury was deprived of that in this case. And I'm long past my time, so if I've answered your question sufficiently, Judge, I'll sit down. Mr. Durbin? Good morning. May it please the court. I'll start with the compulsory process and try to answer a couple of those questions that you all asked. As far as the reasons for removing Ms. Castro, the record, actually the agents give several different reasons. One of them is, and Katani, I don't have the specific citation to it, but I recall Katani said, well, she didn't state she was directly affiliated with the marijuana, although she had a 60-pound load on her lap. She did not say she helped move it. Moncada and Campos both told agents that they helped move the marijuana to enable themselves to get into the car to continue on their journey. So there were statements by Moncada and Campos that actually put them in manipulating the marijuana, moving it around, to further their objectives and at the same time to further the objectives of the driver, which is sort of he had two objectives. He was transporting aliens and she was transporting marijuana. And so by joining into and helping move the marijuana around, they were both helping the driver and they were furthering their own goals of getting to Odessa, which is what their destination is. How much did they pay? We do not know. There's nothing in the record. But they pay. I mean, he was not picking them up to take them to Odessa for fun or because they were in a drug conspiracy together. They were doing this as a, well, that would be my guess, but there's nothing in the record that says that it is or it wasn't. And what happened to him? Was he 17? Did they let him go or was he charged somewhere else? He was 17. As a general matter, juveniles are not charged in federal court. We did not seek authorization to charge the juvenile as a 17-year-old. He was turned over to state custody. My understanding from the record is the state did not proceed against him but he was the main person, right? I mean, he orchestrated this whole thing and did all this drug deal. So far as we know, the other four did not. The child didn't and Ms. Castro didn't and Moncada and Campos did not. Do you believe that she, I guess what your belief is is not the right question. Was it argued to the jury  than the two gentlemen in the backseat because they had just made room for themselves? No. As my recollection of the record is that the issue as to her was the defense argument that it wasn't fair to charge Campos and Moncada and let her go. It wasn't, well, she wasn't guilty but these two are. I don't see that distinction being made. The other reason that Catani gave for the removal was the child, the six-year-old. Did the agent argue that she wasn't guilty but they are? No, Judge. Did the agent say, well, she's unaffiliated with any drug intent to distribute but they are affiliated? She gave that as one of the reasons for why she was not charged. But if she's exactly similarly situated to them, then why would they be charged? Well, they were, she was not charged, I submit, because of the child. We had an issue in El Paso with separation of children. Very hot issue still in 2020. Frankly, it's still a hot issue with me today. Read last month's Atlantic Monthly. It's still a very hot issue. I think the bottom line reason was it was a mother with a six-year-old child and she was a passenger in the car and whatever her level of involvement was, it was outweighed by the circumstance of having to separate the child from the mother. I think that's what the ultimate reason was. I don't have any doubt in my mind that that was the ultimate factor. If we think that they were in custody at the time they were questioned, what happens? That's just a hypothetical. Well, I think you have to break it down by the sequence of the questioning as to when the custody occurred and what the significance is. When the truck pulls up and the door is open and you see that they're going to be going in those cages there. You know, that's not clear to me. I've watched the video several times and it's not clear to me what moment that occurred. What difference does it make if when the Border Patrol took them into custody, that was criminal-type custody, detention, because they were detained to be turned over to Border Patrol. So it's like a continuum. It's the same detention from the get-go. But for Miranda purposes, the custody did not begin when they were turned over. The custody did not begin when the trooper, Trooper Foster, said, basically, they're waiting for Border Patrol. Stay in the car. They were detained then, waiting for Border Patrol. Well, would they have been more or less detained if they had been taken out of the car? They were detained, period. Once you see 50-pound bales of marijuana in the car, those guys were detained. They were detained on the side of the road. They were detained in the car until Border Patrol got there and could physically put them somewhere. Well, they were detained, but that's not the same as custody for purposes of Miranda. And, I mean, this court has considered a number of cases that involve traffic stops where there is a detention while they're awaiting a drug-sniffing dog to come. Don't get me down that road. Well, I understand, Judge, that we generally disagree with you on the facts of Coulter, but those aren't the facts here. Well, assuming, arguendo, that we disagree with you and believe that they were detained when they were told, don't get out of the car, you must stay here, and we're going to ask you some questions now while we're waiting for the next step. Assuming that, whether you think if it's a hypothetical or whether you think it's a case of Miranda, does that require reversal here? As to Moncada, it makes no difference, I submit, because Moncada's incriminating. He had two incriminating statements. One was the response to Border Patrol Agent Ramos's initial question when he first looked in the door of the car and said, do you all know what you're sitting on, marijuana? And I believe Moncada nodded and Campos said yes. The guy with the boots hanging over the back of the backseat, I think that's Campos. I think Moncada is the one who's being frisked. He's the younger of the two. But Moncada's more incriminating statement where he said, I helped move the stuff so we could get back into the car, that was during a subsequent interview where he was Mirandized. He was in custody, and that was in an interview by Catani that was also attended by Moncada. If you exclude his acknowledgement that he knew it was marijuana, you've got a totally separate statement where he acknowledges the nature of his participation. As far as Campos is concerned, his statements came in the car and just after he got out of the car. So if you find that he was in custody, well then I don't see any way around saying that those were uncautioned statements. And then what result in this case? If he was in custody and he made these statements and they could have affected the verdict, then what result in the case? And I think it goes back for retrial. Really? I think that's what happens. I mean, I can't tell you that the evidence was harmless. Mr. Durbin, I appreciate you answering the hypothetical. I'm curious how many Fifth Circuit and Supreme Court cases we would have to overturn to find a Miranda violation on these facts? I mean, I don't know how many cases we have where people are in handcuffs. We have people detained. We had a case where there's 17 to 19 officers surrounding the home. Wright and Ortiz. Do you have any sense of how many of those we'd have to get rid of to find a Miranda violation? Well, I can name at least two of them off the top of my head, is Wright and Ortiz. I mean, I agree with you, Judge Oldham, and that's what I'm saying. I don't think that the custody arose until... And that question wasn't answered by the district court because the district court wasn't called upon to answer when did they go into custody. The question was at the time the statements were made at the roadside, were they in custody for purposes of Miranda? And the district court found no. And if you look at the five factors that this court has looked at and that Judge Richman, you analyzed very closely in the Colter case, I mean, those factors as I see them, I mean, they come out for a conclusion that there was no custody at that time. The questioning was brief. They were held for 25 minutes for Border Patrol to come. They're in the middle of nowhere. This is a stop at mile marker 155 when I did. When Border Patrol did actually take them into custody, where did they take them and why? Well, after the marijuana was unloaded, after they got everybody out of the car and they put them in the van, my understanding is, and there's not a lot of testimony about this on the record, but my understanding is based, I think, on comments by the district court, inside the van, then they made determinations as to their lawful status because that was what Border Patrol's concern was. Then they took them to the Border Patrol station and processed them. So, I mean, hypothetically, I mean, my guess would be that in that transport van, in front of that car, they enter into custody for purposes of Miranda because Border Patrol has made a determination that they're not in the country lawfully and there is at least a misdemeanor violation. Whether or not they have sufficient involvement in the marijuana yet, I don't think Border Patrol was making that determination at this point. Border Patrol's interest was immigration at that point. Okay. Can I just double check? It is while Agent Ramos was walking Campos to the transport vehicle that Ramos asked the second time, why did you cross the... So it's not just while they're sitting in the car. And it's the key, the money quote, I didn't, I just helped, happens when he's walking him to the transport vehicle. Do you admit that's correct? He says absolutely right. That's the way I read the record. There are three pertinent questions to Campos. The first one, Campos answers in the negative. Well, the first one is, do you know you're sitting on marijuana? The answer is yes. Then when he's out of the car, when he's taken out of the car while he's being frisked, he's asking, why did you cross the marijuana? That's the first time it was asked. And Campos says, or I didn't. He answers in the negative. And then moments later, I don't know if it's a full minute, I don't know if it's not, certainly not more than two or three minutes, while he's still doing the frisk, he says, why did you cross the marijuana? And Campos responded, and this is while I think they're walking around the car and headed toward the van. They're not there yet, but they're headed toward the van. And at that point, Campos says, I didn't cross it, I just helped. And that's the most important statement of them all. That is an important, that's correct, Judge. Okay, so why, would those questions, did you answer for Judge Oldham that you said that the two cases would have to be overruled? Would those cases have to be overruled to say that as you're putting someone in a transport vehicle, that you're not, that you're not in, that they have to be overruled or reversed? I mean, why isn't that in custody at that point when you've removed and you're putting you in the vehicle you're taking them away in? Well, because, does that arise to the level of formal arrest? And are those circumstances that were... Did they have a chance to do something else at the time? Well, they didn't have a chance to do anything else at the time because they were in the middle of nowhere. The driver... That's what I've seen from the minute that the car was stopped and the driver was taken out. Why is that? Because they're in the middle of nowhere. They've been in the middle of nowhere presumably for days to cross illegally. Could they have walked away or not? I don't know the answer to that. I don't think so. Okay, they've got his phone and he's handcuffed. Right? They still have his phone. I don't believe he's handcuffed at that point. He's not handcuffed at that point? I don't believe so. Because I thought he was handcuffed at that point. They were already in handcuffs when Agent Ramos first started asking questions. So assume Archie Wendo was in handcuffs from the get-go when he first starts asking questions and they also have his phone. And we have those cases about if you have your driver's license, you're not... if they've got your wallet, you're not, you know, you're detained. Right. And there's no question they were detained. There's no question that they were detained. The question is whether or not that detention rose to the level of the restraints of a formal arrest. And I submit at the time the agents were still trying to determine what their nationality was and what their status was in the United States. And why would they ask him, why did you bring the marijuana across the border? That's an accusatory question. I agree it's accusatory, but that it would call for an incriminating response does not make it necessarily an accusatory question that converts it to a custodial circumstance under Miranda. I mean, Ortiz and Wright, all of those questions that were asked where the court both times found that there was no custody, all of those were asking for incriminating information. And in Ortiz the suspect was taken to a vehicle. In Ortiz he was taken to a vehicle, he was alone in the car with two officers, and he was asked repeatedly questions about the purchase and the location of the rifles. And in Wright he was in a bedroom alone with two other officers. Not a public place, that's an important fact. But not handcuffed, they didn't have his wallet or phone. They had him in the room by himself. I'm just saying there's other factors There are those factors. But then if you look at the nature and the circumstances of Ramos' interview, he is very professional, he's very calm, there's nothing threatening, he's not threatening, he's not aggressive. I was going to say, I was stunned that you so readily admitted well, if that's true, a new trial. Because we do have cases that say just because there's a Miranda violation does not mean that you have to get a new trial. I mean, I just wrote on that not recently. Well, I mean, yeah, but we argued the harmlessness of the statement. I'm assuming from your question that you're finding there's a Miranda violation and therefore the statements were not, that statement was not properly admitted. If we're getting to the question of whether or not the statement was nonetheless voluntary, well, I think on the record the statement was voluntary. It was a voluntary statement under the circumstances. Given the demeanor of Agent Ramos, given the overall circumstances where they were on the side of the law, on the side of the road, there might have been a technical Miranda violation positing the facts hypothetically. I don't think at that point while they're walking to the van that at that point he's in custody. I don't think he was formally arrested and put in custody until they were inside the van because they were holding, they were getting these people together while they were doing this initial investigation of the stop. And that didn't really come to an end until they got those people in the van and brought them to the Border Patrol Station. At that point they were under arrest. I don't, I don't, although the record isn't particularly well developed on that point. Can we move to intent to distribute? Yes. As far as the sufficiency is concerned, first of all with respect to Judge Oldham's standard of review question, we cited United States v. Delgado in our brief, 672 F.3.320. It's an en banc case from 2012. And the circumstances were that Campos and Ayala made a motion for judgment of acquittal at the conclusion of the government's case. When the government rested, that's a record of appeal 676 and 77. Then, Moncada put on testimony of a language expert who Campos relied on and Moncada didn't even argue about it. It didn't have anything to do with Moncada's statement. But anyway, at the close of all the case, when the jury goes out, 673, there is no renewed motion for Moncada's, which he needs to do to preserve it after having put on evidence. With respect to the sufficiency of evidence, I think that the record establishes that they knowingly possessed the marijuana. I'm so sorry, I don't mean to, I want to hear the answer to the Chief's question too. I'm getting to that, yes. But is the government's position and does Delgado hold that? I believe so, but I can't tell you. I've known the rules for so long, Judge, I can't tell you what the origin is. But generally, the motion is preserved at the close of the government's case if the defendant puts on no evidence thereafter. If the defendant puts on evidence thereafter, then the motion must be renewed in order to preserve sufficiency. But all of the evidence can be considered for purposes of evaluating sufficiency. I think that the issue is the evidence, the statements by Boncada and Campos that they were helping, as I said earlier, is that they were joining into the driver's enterprise to transport the marijuana. And the purpose of it was to distribute it. And they were in a circumstance, they weren't possessing it to keep it themselves. So the only thing that follows from that is they were possessing it so that it would be distributed. They may not have been distributing themselves, but the intent was for the marijuana to be distributed. And so they had joined into his marijuana enterprise when they... Well, that's... All right. Go ahead. Go ahead. When they made the decision to move the marijuana to get in the car so they could continue on their journey. They joined into the double purpose that the driver was engaged in. It's sort of circular to me because unless you have evidence, to me at least, that when the driver got to his destination they were going to help him unload the marijuana. That was kind of part of the deal. He could have let them off before he ever got to his location. And the only reason they helped him move the marijuana was so they would have room to get to where they were going. I mean, it seems to me there are key pieces of evidence lacking. And they relinquished the possession back to him. Whatever the nature of their possession of it, whenever they were going to get out, whether before or after the marijuana was... Well, they couldn't have... As Judge Elrod pointed out, they didn't really have possession. If they couldn't have hauled it away when they moved it around, he would have shot them, I'm sure. Well, they couldn't... It couldn't haul away 250 pounds of guns sitting in the lap either, but there's still possession. The possession... Intent to distribute is different from possession. I agree it is. But they... But their intent to distribute was to relinquish it to wherever its destination was. We don't know that. They may have intended to get off at some point before it hit the driver's final destination. At which point, they surrender and relinquish their possessions, which means that it's to... They didn't have possession. They were just passengers in the car. Well, actually, they exercised some dominion and control over it because they moved it around so that they could get into the car. I think that's possession. I think that's adequate. You keep saying possession equals intent to distribute, and I don't see it that way. So, is it just because they're trying to keep from getting squished by it makes them intend to distribute it? I mean, I'm just trying to... At what point does it become... I understand, Judge. This is a very... My time is up, but this is an unusual fact situation. I've not encountered this one. That's extremely unusual. It is. It's perplexing. It is. It's charged this way. And so, I mean, if you find they possessed it, then the question is, did they possess it for themselves or did they possess it so that it would be delivered to somebody else? And you can infer from the quantity that they weren't possessing it for themselves. They may have possessed it for a personal reason. That is, so they could make room for themselves in the car, but they did so to further the driver's own... So, if I got on a bus every day, a public bus, and the bus driver says, I'm using my route to distribute drugs, and I move my bus driver's packet, because I sit behind the bus driver, and I move whatever he has sitting in that chair right behind him, and I move it over or I put it on my lap, and he's telling me that he's using his route as a transportation of drugs, and you don't know where I'm going to get off, whether I'm getting on the same stop that he's transporting the drugs or not. Have I possessed with intent to distribute or have I had an intent to distribute because I got on the bus, and I heard the bus driver tell me that, and I'm holding this thing in my lap. And you did it so that you could go and accommodate so that you could go with him... I'm going to work. I'm going... I'm trying to find work. I'm going to apply for a job downtown. And do you have to move that to get on the bus? I have to move it so that I can sit behind the bus driver because I think that's the safest place on the bus to sit. Yes, I think you've got a problem. Whether we should or would charge it is a different question. So just because I'm sitting in that seat and I move the stuff over without any other evidence of where I'm going or anything, then I'm guilty of intent to distribute. But you know that it's drugs. He says, this is what I do every day on my bus route. I'm a drug dealer. The city doesn't pay me as much money as I need to make. And you know that he's going to distribute it. And you get on and you do it for the purpose and you move it. You take control of it. I move it so I can sit in the chair I like to sit in because I have a phobia of sitting somewhere else on the bus. So the fact that I move the stuff over, but there's no evidence that whether my stop is the same stop as his stop and I've gotten on    not to get on, correct? It's a public bus. I can choose to get on. I can choose not to get on. I can choose not to get on. I can choose not to get on or wait for the next one. But now confronted with those circumstances you could either take another bus or you could accommodate But I'm intending to distribute the drugs because I sit on that chair and move the stuff over? Well you didn't possess them with the intent to keep them. You didn't possess it with the intent to use them. You possessed them with the intent to relinquish them back to the driver. Okay. I think I've taken enough of your time. I apologize. I've taken enough of your time. Thank you all very much. Thank you. To go back to the Miranda issue I wanted to clear up something that came up. Judge Elrod, they were not actually handcuffed. They weren't. Jaramus did not handcuff them at the beginning. He did not handcuff either of our clients. He handcuffed the trooper, the state trooper handcuffed the driver and put him behind the car. Yeah. But our clients were taken out of the car and then escorted directly into the transport. Okay. I appreciate your candor with the court in fixing my error. Thank you. No. And the reason I wanted to is our argument is that at the point that they're being held in the car the car is being used to constrain them and then they see other people going into the transport van. They know that they're going into the transport van. From their perspective they're still restrained to a degree equivalent with arrest. They were in there for 30 minutes. Is that right? They'd been in the car for about 30 minutes. Yes, Your Honor. And that was what I wanted to discuss about the government's position that they become in custody when they're in the transport van and the immigration inquiry occurs. That seems to be answering the question from the perspective of the government. Our position is that our clients reasonably perceive that they were under they were in custody from the moment that the trooper called Border Patrol and said, come and take these guys. They're under arrest. Obviously they know they're in the country illegally. They know what's going to happen next. And so they're under a restraint that they're reasonably perceiving that a reasonable person would equate with a full arrest. Was the suspect taken to a vehicle in Ortiz? Yes. And I think Ortiz is distinguishable though because he was repeatedly told, you're not under arrest. We're just asking you questions. They took a statement and I can't remember if it was Ortiz or the other one but he ultimately left their custody at that But the questioning was 30 minutes. After the questioning occurred. So the questioning was 30 minutes. He was taken to a vehicle. Do you think a reasonable person taken to a police vehicle would think he was free to leave? I don't think it's just the taking to the vehicle. Here it's different because it's a Border Patrol transport van. They're being held in this vehicle and then they're being transferred to another one so that they can then be taken to the station. That's what I think distinguishes them. Thank you. I think it's on the sufficiency issue it's important to look at exactly what we have and what we don't have. When my friend was answering questions Judge Elrod asked about is there evidence of payment. There's nothing in the record about that. The decision's made on the record. He said I guess. Judge Elrod asked another question he said so far as we know which is not at all because it's not in the record. He couldn't cite to it. The defense argument was not O'Costro got better treatment. The defense argument was they didn't prove possession with intent to distribute. The evidence is not there. There's no possession. There's no intent to distribute. Judge Oldham you asked at the  because I unfortunately am under because the motion wasn't renewed by trial counsel that standard. What's the product of that standard given how tough the issue is with the normal standard is? Well the product is a very small set but this case is in that set. The evidence is utterly lacking of intent to distribute and I think it's utterly lacking of possession. So I ask that you reverse. And I appreciate your candor on that too. Do we have a case that's done that that has reversed for sufficiency where it's not preserved or I should say reversed for insufficiency where the argument is not preserved? I honestly don't know off the top of my head. I'd be happy to submit a supplemental letter if the court would like me to do that but my answer to it even if I can't find one and I'd be surprised if there are none but if I can't find one my answer to that is as I said in my long footnote in the end what we're doing under forfeited error or preserved is determining whether they can meet the Jackson versus Virginia standard because that's the constitutional floor. They didn't do it in this case and we would ask that you reverse. Thank you.